ZYGMUNT GOLEK *v.* SAINT MARY'S
HOSPITAL, INC., ET AL.
(AC 32325)

Beach, Espinosa and Peters, Js.

Argued October 26, 2011—officially released January 24, 2012

*Neil L. Moskow,* with whom, on the brief, were *Deborah M. Garskof* and *Stephanie Dellolio,* for the appellant (plaintiff).

*James F. Shea,* with whom, on the brief, was *Holly L. Cini,* for the appellee (named defendant).

*Lisa A. Zaccardelli,* for the appellee (defendant Stanley J. Dudrick).

*Douglas R. Carlson,* pro hac vice, with whom were *John M. Tanski* and, on the brief, *William R. Lee,* pro hac vice, and *Maria E. Kokiasmenos,* for the appellee (defendant Accreditation Council for Graduate Medical Education).

*Opinion*

PETERS, J. This case concerns the propriety of a decision by a hospital that conducts an accredited surgical residency training program to decline to promote a senior resident to the position of chief resident. Unwilling to accept the hospital's proffered renewal of his appointment as a fourth clinical year resident, the resident filed a multicount complaint against the hospital, its surgery program director and its national accrediting association. The resident appeals from adverse rulings in favor of each of these three defendants, focusing on instructional and evidentiary issues that arose in a jury trial and on the propriety of the court's rendering of summary judgment in favor of the remaining two defendants. We affirm the judgment of the trial court.

In a substituted, multicount complaint filed on September 5, 2008, the plaintiff, Zygmunt Golek, alleged that the defendant Saint Mary's Hospital, Inc. (hospital), in breach of its contractual obligations, had failed to provide educational and training services to him and had breached the implied covenant of good faith and fair

dealing.[1] The plaintiff further alleged that the director of the hospital's surgery program, the defendant Stanley J. Dudrick, tortiously had interfered with the plaintiff's business expectations and that Dudrick's conduct was a breach of his fiduciary duty to the plaintiff. Finally, the plaintiff alleged that the organization that accredits the hospital's residency program, the defendant Accreditation Council for Graduate Medical Education (ACGME), was liable for damages to the plaintiff as a third party beneficiary of ACGME's relationship with the hospital. The trial court, *Eveleigh, J.*, granted motions for summary judgment filed by Dudrick and ACGME. A jury returned a verdict in favor of the hospital, which the trial court, *Stevens, J.*, accepted and rendered judgment thereon. The plaintiff has appealed from adverse rulings with respect to these three defendants.[2]

The jury reasonably could have found the following largely undisputed facts. From August 11, 2004, to June 30, 2007, the plaintiff was a resident physician in the hospital's general surgery residency program. Dudrick was the program director. ACGME is a national accrediting body that supervises residency programs in the United States and Canada.

The plaintiff began his association with the hospital on August 10, 2004, when he signed a residency agreement accepting a "categorical" resident position with the hospital. Such a position contemplates that the surgical resident will be promoted, in a series of

---

[1] The trial court, *Roche, J.*, granted the hospital's motion to strike counts of the plaintiff's complaint alleging wrongful discharge, violation of the plaintiff's due process rights, promissory estoppel and negligent and intentional infliction of emotional distress. Although the plaintiff repleaded some of the stricken counts in his substituted complaint, he has not pursued them in this appeal.

[2] The plaintiff has not appealed from the adverse pretrial resolution of additional claims against the hospital and the other defendants.

consecutive yearly contracts, through the various steps of the hospital's residency program, provided that the resident satisfies the program's basic requirements.[3] Because the plaintiff already had been a surgical resident at another hospital, he began his residency with the hospital as a second year postgraduate resident, or PGY 2, for the period of August 11, 2004, through June 30, 2005. The plaintiff subsequently was promoted to a PGY 3 position for the period of July 1, 2005, through June 20, 2006. He was then " 'skip promoted' " to a PGY 5 (clinical research PGY 4) position for the period of July 1, 2006, through June 30, 2007.

The disagreement of the parties arises out of the hospital's decision not to promote the plaintiff to the position of chief resident in July, 2007. At a meeting on April 4, 2007, Dudrick informed the plaintiff that, contrary to the plaintiff's expectations, due in part to his low scores on two sets of national qualifying examinations,[4] the hospital would offer him only a contract to repeat his PGY 5 year. Dudrick previously had warned the plaintiff that it was important for him to

[3] The hospital's surgical residency program was comprised of six levels: first clinical year (PGY 1); second clinical year (PGY 2); postdoctoral research year (PGY 3); third clinical year (PGY 4); fourth clinical year (PGY 5); and chief resident year (PGY 6), the most senior level of residency. Surgical residents must be promoted through each level in order to graduate from the program.

[4] As part of the hospital's surgical residency training program, the plaintiff was required to complete the American Board of Surgery In-Training Surgical Basic Science Examination (ABSITE) each year. The ABSITE is a written examination designed to test overall medical knowledge that is taken each January by all surgical residents. During the course of the plaintiff's residency at the hospital, his ABSITE scores declined from the 38th percentile in 2005, to the 28th percentile in 2006, and to the 11th percentile in 2007. In 2007, the plaintiff twice participated in mock oral board examinations conducted by members of the hospital's own faculty, as well as faculty from other medical institutions. Each time, the plaintiff failed two of the three sections of the examination. The plaintiff has not challenged the accuracy of his test scores or the relevance of these test scores as a measure of his performance of his duties as a surgical resident.

prepare properly for these examinations, which, as the plaintiff concedes, are a predictor of first time pass rates on American Board of Surgery certification examinations and affect a residency program's professional accreditation.

On June 29, 2007, the hospital offered the plaintiff a residency agreement for the 2007–2008 academic year, pursuant to which he would repeat his PGY 5 year. The plaintiff declined the offer and challenged its validity through the hospital's grievance process, alleging that it was "a pretextual decision not to employ him."[5] The plaintiff's challenge was unsuccessful. The plaintiff completed his existing contract and left his employment with the hospital at the end of June, 2007. Approximately twenty months later, in April, 2009, the plaintiff accepted a position as a nonaccredited fellow in the thoracic surgery department at Maimonides Medical Center (Maimonides). Additional facts will be set forth as they become necessary.

I

CLAIMS AGAINST THE HOSPITAL

The plaintiff appeals from the judgment of the trial court, *Stevens, J.*, rendered in favor of the hospital following a jury trial. On appeal, the plaintiff claims that the court improperly (1) instructed the jury on the standard of proof in civil cases and (2) precluded him from presenting relevant evidence to the jury. We are not persuaded.

A

Instruction to the Jury

The plaintiff challenges the propriety of the court's instruction to the jury on the standard of proof in civil

[5] The plaintiff's claim of pretext was grounded on two allegations. He first maintained that, in prior years, another resident had been promoted to chief resident despite poor examination scores. Second, he claimed that Dudrick had taken umbrage at the manner in which the plaintiff had requested a letter of recommendation for a program that Dudrick thought to be unpromising.

cases. Specifically, the plaintiff faults the court for contrasting the burden of proof in a civil case with the burden of proof in a criminal case. He claims that interjecting the concept of proof beyond a reasonable doubt that governs criminal cases was "confusing, incorrect as a matter of law; and deprived the jury of the proper guidance to evaluate [his] claims under the proper standard of proof." The plaintiff duly excepted to the charge at trial. We agree with the hospital and conclude that the court's charge to the jury was not improper.

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 142–43, 757 A.2d 516 (2000).

"An improper instruction on the burden of proof may so mislead the jury as to be potentially harmful to one of the parties and therefore may amount to reversible error." (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 295, 838 A.2d 135 (2004). However, "[a] charge to the jury is not to be critically dissected nor are individual instructions to be judged in artificial isolation from the overall charge. . . . The issue is whether, in view of the charge read as a whole, that portion of the charge

to which objection has been taken can be considered a basis for finding harmful error." (Citation omitted; internal quotation marks omitted.) *State* v. *Moss*, 189 Conn. 364, 367–68, 456 A.2d 274 (1983).

In the present case, a review of the entirety of the court's charge reveals that the jury was instructed properly on the standard of proof. The court began its instruction to the jury by stating: "[O]n TV or in other areas of your lives, you may have heard about a burden of proof which is called or referred to as beyond a reasonable doubt. That is not applicable to this case. This is a civil case and that standard of proof is not applicable." The court then gave a complete and legally accurate charge on the standard of proof applicable in civil cases, stating repeatedly that the relevant burden of proof was a preponderance of the evidence. This portion of the court's charge to the jury followed the text of the Superior Court's standard civil jury instructions.[6] The court reasonably referred to the criminal standard of proof in order to correct any possible jury misconceptions about the governing civil standard. It repeatedly clarified that the criminal standard did *not* apply because the jury was considering a civil case.

Although the plaintiff challenges the court's failure to follow the words of the instruction approved in *Cross* v. *Huttenlocher*, 185 Conn. 390, 394–95, 440 A.2d 952

---

[6] The Superior Court's model jury instructions on the standard of proof in civil cases provide, in relevant part: "In order to meet (his/her) burden of proof, a party must satisfy you that (his/her) claims on an issue are more probable than not. You may have heard in criminal cases that proof must be beyond a reasonable doubt, but I must emphasize to you that this is not a criminal case, and you are not deciding criminal guilt or innocence. In civil cases such as this one, a different standard of proof applies. The party who asserts a claim has the burden of proving it by a fair preponderance of the evidence, that is, the better or weightier evidence must establish that, more probably than not, the assertion is true. . . ." Connecticut Civil Jury Instructions 3.2-1 (revised January 1, 2008), available at http://www.jud.ct.gov/JI/civil/part3/3.2-1.htm (last visited December 28, 2011).

(1981), he has not identified any specific error in the charge as given. The plaintiff's preference for an alternate statement of the standard of proof does not demonstrate impropriety in the charge that was delivered by the court. See *Craine* v. *Trinity College*, 259 Conn. 625, 662, 791 A.2d 518 (2002).

B

Evidentiary Rulings

The plaintiff also challenges numerous evidentiary rulings by the trial court. The plaintiff claims that the court improperly granted the hospital's motion in limine to preclude testimony by a plaintiff's witness and improperly sustained the hospital's objections to other evidence offered by the plaintiff. We agree with the hospital that the plaintiff cannot prevail on his claims of evidentiary error.

"It is well settled that we will set aside an evidentiary ruling only when there has been a clear abuse of discretion." (Internal quotation marks omitted.) *Kalams* v. *Giacchetto*, 268 Conn. 244, 249, 842 A.2d 1100 (2004). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 186, 842 A.2d 567 (2004).

The court granted the hospital's motion in limine to preclude testimony by Stephen J. Lahey, a surgeon whom the plaintiff had proffered to give evidence of the high quality of the plaintiff's surgical services at Maimonides. Concededly, the plaintiff did not begin to work at Maimonides until approximately twenty months after he had left his employment with the defendant hospital. Furthermore, the plaintiff does not contest the accuracy of the hospital's representation that

the plaintiff's surgical position at Maimonides was different in kind from his responsibilities as a surgical resident at the defendant hospital.[7] The plaintiff nonetheless maintains that any evidence of his "superb clinical and surgical skills" was relevant to establish that the defendant's refusal to offer him the position of chief resident was pretextual. In light of the substantial difference between the plaintiff's responsibilities at the two hospitals, we disagree and conclude that the court's ruling was not an abuse of its discretion.

The plaintiff next maintains that the court abused its discretion in sustaining the defendant's objection to five letters from surgeons practicing at the hospital that attested to the plaintiff's surgical skills and their willingness to act as references for him after he had left the hospital's residency program. The plaintiff has not, however, contested the accuracy of the hospital's representation that this evidence would have provided nothing other than additional support for the plaintiff's own, uncontradicted testimony to that effect. Accordingly, we are not persuaded that the plaintiff was prejudiced by the court's adverse ruling.

The plaintiff also claims that the court improperly failed to admit into evidence exhibits containing e-mails from the plaintiff to directors at other residency programs seeking admission after he had left his employment at the hospital.[8] The plaintiff argues that he was prejudiced by the court's refusal to admit exhibits 80 and 80A because they contained evidence of his efforts

---

[7] Indeed, in his brief to this court, the plaintiff states that "the termination from the hospital's residency program prevents [the plaintiff] from being board eligible and from working as a surgeon. . . ."

[8] The exhibits in question are plaintiff's exhibits 80 and 80A. The court refused to admit exhibit 80, which is comprised of e-mails sent by the plaintiff to directors at other residency programs after he had left his employment at the hospital, and denied the plaintiff's motion to admit exhibit 80A, which contains a portion of exhibit 80 that previously had been excluded by the court.

to mitigate his damages. This evidence, however, was irrelevant because the hospital never claimed that the plaintiff had failed to make reasonable efforts to obtain a position in another residency program. Moreover, the plaintiff testified personally about the extent of his efforts to be accepted into another residency program. Accordingly, we are persuaded that the plaintiff was not prejudiced by the court's adverse ruling.

The plaintiff argues further that the court was required to admit exhibit 80A, pursuant to Connecticut Code of Evidence § 1-5 (b),[9] to complete a statement already in evidence. We disagree. The exhibit in question is an unredacted version of an exhibit relied on by the hospital during its cross-examination of the plaintiff. The court excluded the proffered exhibit because the redacted sentence concerned irrelevant material and was not required for context or to complete the statement contained in the admitted exhibit. We conclude that the court's refusal to admit the proffered exhibit was reasonable.

The plaintiff next claims that the court improperly refused to admit minutes from the February 13, 2007 meeting of the hospital's surgical education committee. The plaintiff argues that the minutes indicate that surgical residents customarily are advised of the nonrenewal of their positions a minimum of 120 days before the end of the academic year and, therefore, support his claim that the hospital acted in bad faith. The written policy to which the plaintiff refers, which was admitted into evidence at trial, applies only to residents that are *terminated* from the hospital's surgical residency

---

[9] Connecticut Code of Evidence § 1-5 (b) provides: "Introduction by another party. When a statement is introduced by a party, another party may introduce any other part of the statement, whether or not otherwise admissible, that the court determines, considering the context of the first part of the statement, ought in fairness to be considered with it."

program.[10] Because the plaintiff was not terminated from the program, but chose to withdraw when he was not offered his desired position of chief resident, the court did not abuse its discretion in sustaining the hospital's objection to the proffered exhibit.

The plaintiff further asserts that, in light of the significance of his performance on the ABSITE examinations, the court improperly sustained the hospital's objection to a proffered exhibit that attested to his efforts to prepare himself for the examinations. The proffered exhibit was, however, written in the spring of 2006, one year before the hospital's decision not to promote the plaintiff to the position of chief resident. Because of the exhibit's limited relevance to the issues being litigated, the court's ruling cannot properly be characterized as an abuse of its discretion.

Finally, the plaintiff challenges the propriety of the court's rulings, during his cross-examination of the associate director of the hospital's surgery program, Michael Ajemian, which denied him the opportunity to question the utility of ABSITE examinations as a measure of a surgical resident's performance. The plaintiff's bald assertion that his questions were appropriate is not persuasive. This claim must be dismissed as inadequately briefed. See *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008).

We conclude, therefore, that the plaintiff's appeal from the judgment in favor of the hospital cannot be sustained. The court properly accepted the jury's verdict upholding the hospital's decision not to promote the plaintiff to the position of chief resident.

---

[10] The policy states, in relevant part: "[W]here a resident's agreement is not going to be renewed, the [surgical residency program] must ensure that its ACGME-accredited programs provide the resident(s) with written notice of intent not to renew a resident's agreement no later than four months prior to the end of the resident's current agreement."

## II

## CLAIMS AGAINST DUDRICK

The plaintiff also appeals from the judgment rendered in favor of Dudrick. The plaintiff claims that the trial court, *Eveleigh, J.*, improperly granted Dudrick's motion for summary judgment on counts thirteen and fourteen of the plaintiff's substituted complaint, which alleged that Dudrick tortiously had interfered with the plaintiff's business expectations and had acted in breach of his fiduciary duty to the plaintiff. We are not persuaded.

Our standard of review on appeal is well established. "Summary judgment rulings present questions of law; accordingly, [o]ur review of the . . . decision to grant the defendant's motion for summary judgment is plenary. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . . [A] summary disposition [must] . . . be on evidence which a jury would not be at liberty to disbelieve and . . . where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the [summary judgment]." (Citations omitted; internal quotation marks omitted.) *Farrell* v. *Twenty-First Century Ins. Co.*, 301 Conn. 657, 661–62, 21 A.3d 816 (2011).

### A

### Tortious Interference

The court granted Dudrick's motion for summary judgment on count fourteen of the plaintiff's substituted complaint, alleging tortious interference with the plaintiff's business expectations, on the ground that the plaintiff had failed to present any evidence of actual loss

resulting from Dudrick's allegedly tortious conduct. On appeal, the plaintiff maintains that Dudrick's disparaging comments injured him by causing Greenwich Hospital to deny his request for surgical privileges. We disagree.

To prove a claim of tortious interference with his business expectations, the plaintiff was required to establish: "(1) the existence of a contractual or beneficial relationship, (2) the defendant['s] knowledge of that relationship, (3) the defendant['s] intent to interfere with the relationship, (4) [that the defendant's] interference [with the relationship] was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendant['s] tortious conduct. . . . Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss . . . it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffers actual loss. . . . Therefore, in order to survive a motion for summary judgment the plaintiff must allege an actual loss resulting from the improper interference with [his] contract." (Citations omitted; internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 212–13, 757 A.2d 1059 (2000).

The plaintiff based his claim of tortious interference on Dudrick's alleged misconduct during the plaintiff's employment as a surgical assistant with USA Surgical Services of CT, P.C. (USA Surgical), where the plaintiff worked from October 29, 2007, until he became employed at Maimonides in April, 2009. USA Surgical provides temporary surgical assistant placement services to hospitals in different states, including Connecticut. Accordingly, it requires its employees to demonstrate that they have medical privileges at a number of hospitals. To satisfy this requirement, the plaintiff applied for surgical privileges at Greenwich Hospital in November, 2007. The plaintiff alleges that his request

was denied because of Dudrick's false negative comments about his surgical skills. Dudrick testified that he had informed a physician at Greenwich Hospital that the plaintiff had not completed the defendant hospital's residency program and so could not operate independently without the presence of another staff surgeon. The plaintiff thereafter was advised not to report to Greenwich Hospital but continued to be employed by USA Surgical, where he was compensated for his services at an annual salary of $90,000 to $95,000.

The court rendered summary judgment for Dudrick on the plaintiff's claim of tortious interference as a matter of law because of the plaintiff's failure to present any evidence that Dudrick's statements had caused him to sustain an actual loss. It is undisputed that, despite the plaintiff's being denied surgical privileges at Greenwich Hospital, he continued to receive his regular rate of compensation under the terms of his employment agreement with USA Surgical. The plaintiff has not challenged the propriety of the court's finding that the record does not demonstrate that Dudrick's injurious comments caused him to suffer an actual loss. He cites no authority in support of his claim that an allegation of damage to his professional reputation suffices to establish actual loss, and we know of none. We therefore affirm the judgment of the court granting Dudrick's motion for summary judgment as to count fourteen of the plaintiff's substituted complaint.

## B

### Breach of Fiduciary Duty

The court granted Dudrick's motion for summary judgment on count thirteen of the plaintiff's substituted complaint, alleging that Dudrick's conduct was in breach of his fiduciary duty to the plaintiff. The court aptly noted that, in order to maintain a claim for breach of fiduciary duty, the plaintiff was required first to prove

the *existence* of a fiduciary relationship. E.g., *Murphy v. Wakelee*, 247 Conn. 396, 400, 721 A.2d 1181 (1998). Concluding that the plaintiff had failed to present a factual basis for his claim, the court ruled against the plaintiff and in favor of Dudrick. On appeal, the plaintiff claims that Dudrick, as director of the hospital's surgery program, had a fiduciary obligation to represent the plaintiff's interest in becoming chief resident. We affirm the judgment of the court.

"It is well settled that a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . . Although this court has refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations . . . . we have recognized that not all business relationships implicate the duty of a fiduciary. . . . In particular instances, certain relationships, as a matter of law, do not impose upon either party the duty of a fiduciary." (Citations omitted; internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 640, 804 A.2d 180 (2002). The fact that one party trusts another is not dispositive of whether a fiduciary relationship exists; see *Forte* v. *Citicorp Mortgage, Inc.*, 66 Conn. App. 475, 490, 784 A.2d 1024 (2001); rather, proof of a fiduciary duty requires an evidentiary showing "of a unique degree of trust and confidence between the parties such that the [defendant] undertook to act primarily for the benefit of the plaintiff." (Internal quotation marks omitted.) Id., 489.

In the present case, nothing in the record raises the factual inference that a fiduciary relationship existed between Dudrick and the plaintiff while the parties were negotiating the plaintiff's role in the surgical residency program. As the court noted, the plaintiff is an adult

who voluntarily became a physician and entered the hospital's surgical residency program. The plaintiff alleges that Dudrick, in his role as program director, sometimes praised and sometimes criticized the plaintiff's performance and that he certified surgical residents' performance records to ACGME. That history does not suffice to establish anything other than a form of a student-teacher relationship. We know of no case, and the plaintiff has cited none, to support the proposition that such a relationship, without something more, was fiduciary in nature or that Dudrick should be deemed to have undertaken a duty " 'to act primarily for the benefit of the plaintiff.' " Accordingly, we affirm the judgment of the court granting Dudrick's motion for summary judgment as to count thirteen of the plaintiff's substituted complaint.

## III

### CLAIMS AGAINST ACGME

The plaintiff's final claim on appeal is that the trial court, *Eveleigh*, *J.*, improperly granted ACGME's motion for summary judgment on count eleven of the plaintiff's substituted complaint, which alleged that the plaintiff was a third party beneficiary of the accreditation agreement between ACGME and the hospital and that he had been injured by the hospital's breach of that agreement. We affirm the judgment of the court.

"Summary judgment rulings present questions of law; accordingly, [o]ur review of the . . . decision to grant the defendant's motion for summary judgment is plenary. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . ." (Citation omitted; internal quotation marks omitted.) *Farrell* v. *Twenty-First Century Ins. Co.*, supra, 301 Conn. 661–62.

The court rendered summary judgment for ACGME on the plaintiff's breach of contract claim, holding that the record established that ACGME was not a party to the employment contract between the plaintiff and the hospital.

On appeal to this court, the plaintiff reiterates his contention that, by setting and enforcing accreditation standards, ACGME manifested its intent to benefit the surgical residents enrolled in the hospital's training program and to assume responsibility for improprieties in their treatment by the hospital. He points to evidence of ACGME's investigation of his complaint that he improperly had been denied a contract as chief resident and ACGME's subsequent decision not to withdraw the hospital's accreditation. We disagree.

The law regarding the creation of contract rights in third parties in Connecticut is well settled. "[T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] and . . . that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." (Internal quotation marks omitted.) *Grigerik* v. *Sharpe*, 247 Conn. 293, 311–12, 721 A.2d 526 (1998).

The court found that, to be accredited by ACGME, a hospital must be " 'in substantial compliance' " with ACGME program requirements applicable to each specific program. ACGME's accreditation standards state certain subjects that the hospital must address, but ACGME was not involved in any day-to-day supervision of the plaintiff's clinical training. After investigating the plaintiff's allegations that the hospital improperly had denied him the promotion to chief resident, ACGME

determined that the accreditation status of the hospital's surgical residency program would not change.

Without challenging the accuracy of the court's description of the relationship between ACGME and the hospital, the plaintiff claimed that ACGME nonetheless was responsible for his failure to become chief resident because he is a foreseeable third party beneficiary of the accreditation agreement between ACGME and the hospital. The court rejected the plaintiff's claim as a matter of law. It held, under well established case law; see *Pelletier* v. *Sordoni/Skanska Construction Co.*, 264 Conn. 509, 532, 825 A.2d 72 (2003); that foreseeability, alone, was not a sufficient basis for the creation of third party liability.

In the absence of language in the accreditation agreement expressly attesting to the parties' intent to benefit the plaintiff, the court examined the terms of the accreditation agreement to ascertain its purpose and scope. It agreed with the plaintiff that the contract between ACGME and the hospital concerned the hospital's accreditation and manifested the parties' intent to advance the education of resident physicians. The court nonetheless held that such evidence did not establish that ACGME had manifested an intent to *obligate itself* to the plaintiff. Accordingly, the court rejected the plaintiff's claim that he had adduced probative and sufficient evidence to support his claim to recover as a foreseeable beneficiary of the accreditation agreement and granted ACGME's motion for summary judgment. The court did not disagree with the plaintiff's contention that he had introduced sufficient evidence to show that the accreditation agreement was intended to *benefit* him and other residents at the hospital. It held, instead, that this evidence was insufficient to prove the plaintiff's claim as a matter of law because the plaintiff had failed to introduce evidence, as required by *Grigerik*,

that the terms of the accreditation agreement manifested "the intent of the parties to the contract . . . that the promisor should assume a direct obligation to the [alleged] third party [beneficiary] . . . ." (Internal quotation marks omitted.) *Grigerik* v. *Sharpe*, supra, 247 Conn. 312.

Under the circumstances of this case, to prevail on his claim for breach of contract, the plaintiff was required to present evidence within the terms of the accreditation agreement that both ACGME and the hospital had intended to extend not only to benefit him, but also to extend contractual rights to him. See id., 311–12. The plaintiff's proffered evidence does not satisfy this test.[11] We agree with the court that there exists no genuine issue of material fact regarding the plaintiff's claim for recovery from ACGME. The plaintiff has introduced no evidence that he qualifies for recovery as a third party beneficiary of the accreditation agreement between ACGME and the hospital pursuant to the requirements set out in *Grigerik*. The evidence on which the plaintiff relies might persuade a trier of fact that the plaintiff had received certain benefits from that agreement, but it does not suffice to create an issue of fact as to whether the hospital and ACGME intended to obligate themselves to him contractually. Accordingly, we affirm the judgment of the court granting ACGME's motion for summary judgment on count eleven of the plaintiff's substituted complaint.

## IV

## CONCLUSION

The record in this case documents an unfortunate disagreement between a senior resident in surgery and a training hospital. Despite the fact that the plaintiff

[11] The court noted that the plaintiff had failed to cite a single case, from any jurisdiction, in support of his third party beneficiary claim. The plaintiff's appellate briefs are similarly deficient.

had, in many ways, performed well in the hospital's surgical residency program, the hospital relied on significant documented deficits in his more recent tests to deny the plaintiff the contract for chief resident that he had expected to receive. The plaintiff's unwillingness to accept a different contract led him to sever his relationship with the hospital and, inferentially, deprived him of future professional opportunities that he might otherwise have expected to enjoy. On the record before us, none of the defendants cited by the plaintiff bears legal responsibility for this outcome, regardless of how disappointing it may be for the plaintiff.

The judgment is affirmed.

In this opinion the other judges concurred.